11

## IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
### CIVIL DIVISION

MARGARET LISTER, as personal
representative of the Estate of CLINT
JOSHUA GREY, deceased; and
KIMBERLY GREY, individually,

        Plaintiffs,

v.

        Case No.:   06-01380
        Division :   F

PRISON HEALTH SERVICES, INC.,
a foreign corporation; and DAVID GEE,
in his capacity as Sheriff of Hillsborough
County, Florida,

        Defendants.
_____/

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs MARGARET LISTER, as personal representative of the Estate of

CLINT JOSHUA GREY, deceased; and KIMBERLY GREY, individually sue

defendants PRISON HEALTH SERVICES, INC. ("Prison Health") and DAVID

GEE ("GEE" or the "Sheriff") in his capacity as Sheriff of Hillsborough County,

Florida, and allege:

### COUNT I
### (Medical Negligence/Respondeat Superior against Prison Health)

1.    This is an action for damages that exceed $15,000.00.

2.    Plaintiff Kimberly Grey is a citizen of the State of Florida. Plaintiff

Margaret Lister is the personal representative of the Estate of CLINT JOSHUA GREY, deceased. The Estate is being administered in H llsborough County, Florida. The potential beneficiaries of the estate are a) the Estate of Clint Joshua Grey and b) Kimberly Grey.

3. Prison Health is a corporation organized under the law of the State of Delaware and having its principal place of business in the State of Tennessee. 4.

4. Pursuant to a written contract with defendant GEE or his predecessor, Prison Health was endowed with responsibility regarding the provision of health and medical services to persons in custody within the Hillsborough County Jail system, and was charged with responsibility to ensure that all inmates received timely and adequate medical treatment, within the applicable standard of care. This duty extended to Kimberly Grey and her son, Clint Joshua Grey.

5. Plaintiff has complied with the pre-suit notice and investigation provisions of Chapter 766, Florida Statutes. All conditions precedent to the institution of this action have been satisfied or have occurred, including the delivery, by certified mail, of Notices of Intent to Initiate claims for medical negligence.

6. Pursuant to sections 766.104 and 766.203, Florida Statutes, the undersigned attorney certifies that a reasonable investigation has been conducted as to the matters alleged herein, and that it has been determined that there are grounds

2

for a good faith belief that there has been negligence in the care and treatment of Kimberly Grey and Clint Joshua Grey, deceased, and that grounds exist for the filing of this action against Prison Health.

7.      The below detailed acts or omissions by the nurses and staff of Prison Health at the Hillsborough County Jail occurred within the course and scope of their agency or employment with Prison Health. Pursuant to the doctrine of *respondeat superior*, Prison Health is liable for the negligent acts or omissions of its employees and agents.

8.      Prison Health wrongfully denied this claim at the conclusion of the mandatory presuit period imposed by chapter 766, Fla. Stat., and failed to participate in good faith in presuit discovery.

9.      Kimberly Grey was taken into custody and incarcerated in the Hillsborough County Jail on February 20, 2004. At that time and place, Kimberly Grey made clear to all medical personnel with whom she came in contact that she was pregnant. Her statements were confirmed by a positive pregnancy test.

10.     On February 24, 2004, Kimberly Grey was evaluated at Tampa General Hospital for a potential miscarriage and was treated for cold and flu like symptoms. Personnel at Tampa General Hospital determined that Kimberly Grey had not miscarried, the baby was still viable, and returned Kimberly Grey to jail,

3

with instructions to return if she experienced more than 5 to 6 contractions an hour or if she were to rupture her membranes. Discharge instructions included "labor precautions" and the cautionary statement that a rupture of membranes might be a sudden gush of fluid or a constant leakage. In determining the difference between amniotic fluid and urine, the statement cautioned "If you are not sure, come to the hospital to be examined."

11. Kimberly Grey continued to leak amniotic fluid after her release from Tampa General Hospital. Some time after 4:00 p.m. on March 4, 2004, Kimberly Grey went into labor. Prison Health Employees at the Hillsborough County Jail noted that she had a fever of 101 degrees Fahrenheit, displayed a greenish vaginal discharge, that she complained of back pain, and that they observed a mucous plug in the toilet.

12. Prison Health Employees at the jail knew or should have known that Kimberly Grey's pregnancy was a high risk pregnancy and that a birth at that point would be premature. Despite such knowledge, Kimberly Grey was not transported to a hospital at that time. Nor was she seen by an obstetrician or obstetrical nurse practitioner.

13. Later that evening, at approximately 9:00 p.m., laboratory tests revealed that Kimberly Grey had a white blood cell count in excess of 25,000,

4

strongly suggesting a serious infection, and a red blood cell count of 3.9, suggesting blood loss. These laboratory results were communicated to a nurse employee of Prison Health, named "Devine" before 10:00 p.m. Devine's orders in response to these lab results were to administer Tylenol and to "keep an eye on [Kimberly Grey]."

14.    Devine was called by Prison Health employees at the jail despite the knowledge that Devine was not on duty because there was no one else to call who could be counted on to return a page.

15.    Kimberly Grey continued to experience back pain and discomfort that evening and into the early morning of March 5, 2004. No electronic fetal heart monitoring was initiated, and no monitor was placed to assess the presence or intensity of contractions. In fact, the nurse on duty, Katherine Pippin, R.N., was not knowledgeable regarding the performance of a proper pelvic examination, and did not perform a pelvic exam.

16.    Nurse Pippin had, on multiple occasions before March 4, 2004, discussed with her Prison Health nursing supervisor the fact that Pippin was uncomfortable being the only nurse on duty in the female infirmary, both because Pippin lacked recent OB experience and because of what Pippin believed was insufficient staffing.

5

17.     Pippin also let her supervisor know that she did not know how to assess whether a patient was going into labor, how to determine whether a patient was dilated or effaced, or how to determine what stage of labor a patient was in. Pippin summarized her discomfort by telling her supervisor, on multiple occasions, that something bad was going to happen. Despite these concerns, Pippin was assigned to provide care to pregnant inmates at the infirmary, and to do so alone.

18.     Over the course of several hours from the evening of March 4, 2004, until the early morning of March 5, 2004, Kimberly Grey's contractions and complaints were relayed by Prison Health Nurses to Divine. Neither Divine nor any other obstetrical nurse ever physically appeared and personally assessed Kimberly Grey at any time. The Prison Health Nurses never performed a pelvic exam on Kimberly Grey while she was leaking fluid at the Hillsborough County Jail. In fact, nurses attending Kimberly Grey were unable to perform a pelvic exam because of a lack of training and experience.

19.     Also over the course of the evening and into the early morning, Kimberly Grey, who had experienced active labor at least four other times, informed Prison Health nurses that she was in labor. The nurses told her that she was not. Kimberly Grey's complaints of pain and her attendant sobbing were

6

dismissed as "mood swings."

20.   At approximately 2:45 a.m. on March 5, 2004, Kimberly Grey gave birth to Clint Joshua Grey while over a jail toilet. Clint Joshua Grey was born with a nuchal chord and required immediate medical intervention.

21.   At no time from the onset of labor until delivery of the child had a pelvic examination been done. At no time on March 24 or 25, 2004, had either of the Prison Health nurses placed a call to the on-call nurse practitioner or the on call physician.

22.   Prison Health nurses and medical staff were untrained and unfamiliar with resuscitation and care of newborn infants, and Clint Joshua Grey did not receive appropriate care and support following his birth.

23.   Over the course of these events, Prison Health nurses refused to call an ambulance or to otherwise arrange for a transfer to the hospital. Finally, a detention deputy, Holly Deluca, called 911. After doing so, she was verbally rebuked by her supervisor and told by the master controller, a sheriff's employee, that medical had to authorize an ambulance.

24.   Emergency Medical Services personnel arrived shortly after 3:00 a.m. on March 5, 2004, and transported Clint Joshua Grey and his mother to Tampa General Hospital. Clint Joshua Grey was pronounced dead on arrival.

7

25.    The acts and omissions set out above, including the failure to timely and appropriately transfer Kimberly Grey to the hospital, the failure to perform appropriate examinations, and the failure to have a trained, knowledgeable staff to care for Kimberly Grey, constitute breaches of the prevailing standard of care, skill and treatment which is recognized as acceptable and appropriate by reasonably prudent similar health care providers in the community.

26.    As a direct and proximate result of the above wrongful acts, Clint Joshua Grey died and Kimberly Grey suffered bodily injury and resulting pain and suffering, medical and nursing care and expense, mental anguish, loss of capacity for the enjoyment of life, disability, and aggravation of a previously existing condition. The damages are continuing and she will suffer them in the future, and they flow both from the negligent treatment she received and the death of her son.

27.    The conduct causing Kimberly Grey's injuries and Clint Joshua Grey's death was so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct; or the conduct showed such an entire lack of care that there must have been conscious indifference to the consequences; or the conduct showed such an entire lack of care that there must have been wanton or reckless disregard for the safety of the public; or the conduct showed such reckless indifference to the rights of

8

others as to be equivalent to an intentional violation of those rights.

WHEREFORE Plaintiffs demand judgment against Prison Health for compensatory damages, costs, and such other and further relief as this court may deem proper. **Plaintiffs demand jury trial on all issues.**

### COUNT II
### (Direct Negligence Against Prison Health)

28.    Plaintiffs reallege paragraphs 1 through 27.

29.    Prison Health is, and before the events described above was, personally aware of numerous problems concerning grossly substandard medical care provided by Prison Health in Hillsborough County, in neighboring Pinellas and Polk Counties, and across the nation.  Prison Health was also aware of numerous problems with its delivery of health care services to pregnant inmates at facilities across the country, including fetal and newborn deaths in Lee County, Florida and Albany, New York.

30.    Despite the gross and repeated malpractice committed by PHS and its employees, Prison Health had not trained its employees, charged with caring for pregnant inmates and detainees, on appropriate monitoring of fetal heart tones; the

9

significance of vaginal Ph; the use of a UA dipstick, and other diagnostic tests to be directed by the Medical Director or the patient's physician.  Prison Health did not have in place any means for electronic fetal monitoring despite the fact that it has treated more than 500 pregnant inmates in Hillsborough County since 2002.

31.    Katherine Pippin, R.N. and Debbie Divine, ARNP, had both voiced their concerns to Prison Health supervisors about inadequate care, inadequate training, inadequate staffing, and insufficient equipment prior to March 2004. Those concerns went unheeded and unaddressed by Prison Health.

32.    Despite its responsibility for providing care to pregnant inmates, Prison Health failed to appropriately train its employees on the signs and symptoms of active labor.  On march 4, 2004, it had assigned to the female infirmary at Falkenberg Road Jail an nurse (Pippin) whose only obstetrical experience was twenty-six tears earlier as a nursing student.  Pippin considered herself unqualified for her position, and voiced concerns about her lack of training.  She never received any instruction on how to perform a pelvic examination while employed by Prison Health despite being led to believe she would be.

33.    Prison Health failed to appropriately train its employees on the normal parameters for fetal heart tones and their relation to gestational age of the

10

fetus; resuscitation and care of the neonate; and preparation of the mother and/or her baby for transport to a birthing facility or hospital.

34.  Despite its knowledge of systemic problems with its delivery of correctional medical services, Prison Health continues to do business as usual, as inmate after inmate suffers injury or death in facilities at which Prison Health is the medical provider.

35.  Following the delivery and death of Clint Joshua Grey, Nurse Pippin was "written up" for failing to contact the medical nurse practitioner on call; yet she was also told by a nursing supervisor that she"did nothing wrong."

36.  Nurses notes reflecting the events of the early morning of March 5, 2004, were actually written after 7:00 a.m. on March 5 and not contemporaneously with the events described.  The notes, written more than five hours after the events described therein, do not contain any annotation of a "late entry" and are the second draft of notes written by Katherine Pippin and edited by a Prison Health nursing supervisor and Debbie Divine.  The edited version contains no record of the editing process.

37.  Following the birth and death of Clint Joshua Grey on March 5, 2004, before the arrival of Sheriff's investigators, staff at the infirmary deliberately destroyed evidence by cleaning the room in which Kimberly Grey had been

11

confined before it could be photographed, inventoried, or otherwise documented. This was in direct contravention of Sheriff's Office SO? and reasonable protocol under the circumstances.

38.     The failure to properly train staff, the failure to properly equip the Falkenberg Road Jail female infirmary, and the failure to provide sufficient staff to meet the serious medical needs of inmates, including Kimberly Grey, constitute breaches of the prevailing standard of care, skill and treatment which is recognized as acceptable and appropriate by reasonably prudent similar health care providers in the community.

39.     As a direct and proximate result of the above wrongful acts, Clint Joshua Grey died and Kimberly Grey suffered bodily injury and resulting pain and suffering, medical and nursing care and expense, mental anguish, loss of capacity for the enjoyment of life, disability, and aggravation of a previously existing condition. The damages are continuing and she will suffer them in the future, and they flow both from the negligent treatment she received and the death of her son.

40.     The conduct causing Kimberly Grey's injuries and Clint Joshua Grey's death was so gross and flagrant as to show a reckless disregard of human life or of the safety of persons exposed to the effects of such conduct; or the conduct showed such an entire lack of care that there must have been

conscious indifference to the consequences; or the conduct showed such an entire

lack of care that there must have been wanton or reckless disregard for the safety

of the public; or the conduct showed such reckless indifference to the rights of

others as to be equivalent to an intentional violation of those rights.

WHEREFORE Plaintiffs demand judgment against Prison Health for

compensatory damages, costs, and such other and further relief as this court may

deem proper. **Plaintiffs demand jury trial on all issues.**

## COUNT III
### *(Negligence against GEE/Respondeat Superior)*

41.    This is an action for damages that exceed $15,000.00.

42.    GEE is the Sheriff of Hillsborough County, Florida.

43.    Plaintiff KIMBERLY GREY is a citizen of the State of Florida.

Plaintiff MARGARET LISTER is the personal representative of the Estate of

CLINT JOSHUA GREY, deceased. The Estate is being administered in

Hillsborough County, Florida.   The potential beneficiaries of the estate are a) the

Estate of Clint Joshua Grey and b) Kimberly Grey.

44.    At all material times, GEE or his predecessor had the obligation and

non-delegable duty to provide access to appropriate medical care to pretrial

13

detainees and prisoners in each of the Hillsborough County Jails, including Kimberly Grey.

45. At all material times, GEE or his predecessor, Sheriff Cal Henderson, controlled or had the right to control the conduct of its agents, servants, or employees, including nurses and staff at the Hillsborough County jails.

46. Plaintiffs have complied with the pre-suit notice requirements of Fla. Stat. §768.78 by serving a statutory notice letter on the defendant and the Department of Financial Services.

47. On March 4, 2004, while incarcerated at the Hillsborough County Jail's Falkenberg Road infirmary, Kimberly Grey went into labor.

48. At that time and place, she was attended by a detention deputy named Holly Deluca, as well as a nurse named Katherine Pippin.

49. Beginning some time after 4:00 p.m. on March 4, 2004, and progressing through the night and into the early morning hours of March 5, 2005, Kimberly Grey's labor progressed. Grey pleaded and begged to be sent to the hospital, but neither Pippin nor Deluca called an ambulance.

50. As a detention deputy, Holly Deluca had both the right and the duty to call an ambulance if she deemed a situation to be a medical emergency to which medical personnel were not adequately responding.

14

51.     As time progressed, it became increasingly apparent that medical
personnel were not adequately addressing Kimberly Grey's medical situation, and
that is was in fact a medical emergency.

52.     As Kimberly Grey screamed and moaned in pain and pleaded with
Deputy Deluca to be sent to the hospital, Deputy Deluca and Nurse Pippin
continually ignored these pleas.

53.     Finally, as Kimberly Grey delivered her baby boy over a jail toilet,
Deputy Deluca called the central controller at the jail and asked for an ambulance.

54.     The jail central controller refused, informing Deputy Deluca either
that she needed to get approval from the hospital or that a medical person had to
request an ambulance.

55.     After initially thumbing through the telephone book to look for
Tampa General Hospital's number (while Kimberly Grey was screaming in
agony), Deputy Deluca decided to call 911 directly. After doing so, she was
verbally reprimanded.

56.     Since it was not summoned before the birth, the ambulance did not
arrive timely.

57.     Following the birth of Clint Grey, Deputy Deluca either participated
in cleaning up the scene of the incident or allowed it to be cleaned, before the

arrival of investigators and their examination of the scene, in violation of sheriff's office SOP or Florida Criminal law, or both.

58.   Also following the incident, Deputy Deluca and a sergeant collaborated on a report describing the events, and Deputy Deluca deleted reference to her being reprimanded at the instance of the sergeant.

59.   Deputy Deluca negligently failed to summon medical help by calling an ambulance or dialing 911 when it was apparent that a reasonable deputy in the same or similar circumstances would have done so.

60.   As a direct and proximate result, Clint Joshua Grey died and Kimberly Grey suffered bodily injury and resulting pain and suffering, medical and nursing care and expense, mental anguish, loss of capacity for the enjoyment of life, disability, and aggravation of a previously existing condition. The damages are continuing and she will suffer them in the future, and they flow both from the negligent treatment she received and the death of her son.

61.   Pursuant to Fla. Stat. §768.78, this action lies against GEE and not against Deputy Deluca and GEE is responsible for Deluca's wrongful acts.

WHEREFORE Plaintiffs demand judgment against GEE for compensatory damages, costs, and such other and further relief as this court may deem proper. **Plaintiffs demand jury trial on all issues.**

16

## COUNT IV
### (*Negligent Hiring and Retention against GEE*)

62.    This is an action for damages that exceed $15,000.00.

63.    At all material times, the Sheriff was and remains a Florida Constitutional officer. His duties include providing adequate health care to inmates within the Hillsborough County Jail System, including Kimberly Grey.

64.    The Sheriff's duty to provide adequate medical care to inmates in the Hillsborough County Jail System is a non-delegable duty.

65.    The Hillsborough County Sheriff contracted with Prison Health for the provision of medical and nursing care to its inmates. A copy of that contract is attached hereto as Exhibit "A."

66.    Prior to entering into that contract, the Sheriff failed to take reasonable steps to investigate the background and history of Prison Health.

67.    As part of its pre-contract investigation efforts, the Sheriff sent out six surveys to agencies in Florida that had previously employed Prison Health. Only two were returned. The Sheriff made no effort to follow up on the unreturned surveys, and made no effort to contact any agencies outside Florida, despite the fact that Prison Health does business in 36 other states.

68.    Any reasonable investigation would have revealed that Prison Health

had an abysmal track record, having been named a defendant in scores of lawsuits, including at least one suit where a baby was born in custody and subsequently died.

69.    After being hired, the Sheriff conducted audits of Prison Health's performance. Prison Health failed virtually every audit.

70.    Over the period of one year before the birth of Clint Grey, Prison Health failed audits in 15 categories and the Sheriff fined it $58,000.

71.    Prison Health also was cited several times for failing to have adequate medical staff at county jail infirmaries, as required by the contract with the Sheriff's office.

72.    Prison Health failed to properly monitor inmates undergoing alcohol or drug withdrawal, timely respond to requests for medical attention, or keep records of staff schedules and medications.

73.    Additionally, Prison Health was cited repeatedly for failing to give appropriate discharge instructions to inmates when they were released from the infirmary, and for failing to obtain X-ray and other radiology services when indicated.

74.    In February 2004, the same month Kimberly Grey entered the Hillsborough County Jail, the Sheriff fined Prison Health $5,000.00 for failing to

18

respond to requests for medical attention and failing to give patients proper discharge and follow- up instructions.

75.    In response to such poor performance on these internal audits, any reasonable person would have terminated the contract with Prison Health and hired another provider.   Instead, the Sheriff simply stopped doing the audits.

76.    In summary, the Sheriff negligently failed to do a reasonable investigation into Prison Health's background before hiring it, and ignored Prison Health's substandard performance during the course of its contract.

77.    Such negligence and carelessness carried with it the foreseeable injury of inmates, including Kimberly Grey.

78.    As a direct and proximate result of the Sheriff's negligent hiring and retention of Prison Health, Kimberly Grey and her son received grossly negligent medical care at the hands of Prison Health Services, Inc.

79.    As a result, Clint Joshua Grey died and Kimberly Grey suffered bodily injury and resulting pain and suffering, medical and nursing care and expense, mental anguish, loss of capacity for the enjoyment of life, disability, and aggravation of a previously existing condition.   The damages are continuing and she will suffer them in the future.

19

WHEREFORE Plaintiffs demand judgment against GEE for compensatory damages, costs, and such other and further relief as this court may deem proper.

**Plaintiffs demand jury trial on all issues.**

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by facsimile and U.S. Mail to **Christina Mesa, Esq.**, 4905 West Laurel St., Suite 100, Tampa, Florida 33607; and **John Owens, Esq.**, 501 E. Kennedy Boulevard, Suite 1700, Tampa, Florida 33602 this 27th day of February, 2006.

**TRENTALANGE & KELLEY, P.A.**

**MICHAEL J. TRENTALANGE, ESQ.**
Florida Bar No.: 0850942
One Harbour Place, Suite 250
777 S. Harbour Island Boulevard
Tampa, Florida 33602
(813) 226-1080    Fax:  (813) 226-1081
**Attorneys for Plaintiffs**

20